IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MARLENA M.,<br><br>            Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting Commissioner<br>of Social Security,<br><br>            Defendant. | REPORT AND RECOMMENDATION<br><br><br><br>Case No. 4:22-cv-00099-DN-PK<br><br>District Judge David Nuffer<br>Magistrate Judge Paul Kohler |

Before the Court is Plaintiff's appeal of the denial of her application for disability insurance benefits.[1] This Motion is referred to the undersigned from District Judge David Nuffer pursuant to 28 U.S.C. § 636(b)(1)(B).[2] The Court recommends that the Commissioner's decision be affirmed.

## I.  STANDARD OF REVIEW

This Court's review of the administrative law judge's ("ALJ") decision is limited to determining whether their findings are supported by substantial evidence and whether the correct legal standards were applied.[3] "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"[4] The ALJ is required to

---

[1] Docket No. 11, filed March 20, 2023.

[2] Docket No. 7.

[3] *Rutledge v. Apfel*, 230 F.3d 1172, 1174 (10th Cir. 2000).

[4] *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

consider all of the evidence, although they are not required to discuss all of the evidence.[5] If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed.[6] The Court should evaluate the record as a whole, including the evidence before the ALJ that detracts from the weight of the ALJ's decision.[7] However, the reviewing court should not re-weigh the evidence or substitute its judgment for that of the Commissioner.[8]

## II.  BACKGROUND

A.    PROCEDURAL HISTORY

In September 2017, Plaintiff filed an application for disability insurance benefits.[9] Plaintiff's claim was denied initially and upon reconsideration.[10] Plaintiff then requested a hearing before an ALJ, which was held on June 10, 2021.[11] A supplemental hearing was held on March 9, 2022.[12] The ALJ issued a decision on June 10, 2022, finding that Plaintiff was not disabled.[13] The Appeals Council denied Plaintiff's request for review on October 31, 2022,[14] making the ALJ's decision the Commissioner's final decision for purposes of judicial review.[15]

---

[5] *Id.* at 1009–10.

[6] *Richardson*, 402 U.S. at 390.

[7] *Shepherd v. Apfel*, 184 F.3d 1196, 1199 (10th Cir. 1999).

[8] *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir. 2000).

[9] R. at 320–26.

[10] *Id.* at 142–45, 148–50.

[11] *Id.* at 77–118.

[12] *Id.* at 53–76.

[13] *Id.* at 9–52.

[14] *Id.* at 1–6.

[15] 20 C.F.R. §§ 416.1481, 422.210(a).

On December 20, 2022, Plaintiff filed her complaint in this case.[16] The Acting Commissioner filed an answer and the administrative record on February 16, 2023.[17] Plaintiff filed her Opening Brief on March 20, 2023.[18] The Acting Commissioner's Answer Brief was filed on June 30, 2023.[19] Plaintiff filed her Reply on July 13, 2023.[20]

B.    MEDICAL EVIDENCE

Plaintiff sought disability based on a back injury she sustained in February 2017 while working as a custodian.[21] Plaintiff stated that her injury made it difficult to stand, sit, or walk for long distances.[22] On February 17, 2017, Plaintiff was seen by Shauna McBride, PA-C, for completion of Family and Medical Leave Act ("FMLA") paperwork.[23] PA-C McBride noted that Plaintiff moved slowly and gingerly.[24] Plaintiff was referred to physical therapy, which provided limited relief.[25]

Plaintiff continued to seek treatment for her back pain in March and April 2017.[26] A lumbar MRI on May 1, 2017, showed grade 1 spondylolisthesis with bilateral spondylolysis at L5-S1 and moderate to severe bilateral neural foraminal narrowing with contact and some

---

[16] Docket No. 1.

[17] Docket No. 8.

[18] Docket No. 11.

[19] Docket No. 20.

[20] Docket No. 21.

[21] R. at 370.

[22] *Id.* at 392.

[23] *Id.* at 804.

[24] *Id.*

[25] *Id.* at 539–649.

[26] *Id.* at 784, 788, 792, 800.

displacement or compression of the exiting L5 nerve roots bilaterally.[27] On May 10, 2017, Plaintiff was seen by Rick Obray, M.D.[28] Dr. Obray recommended a lumbar epidural steroid injection,[29] which she received in June.[30] However, Plaintiff reported no relief from this injection.[31]

On August 14, 2017, Plaintiff underwent physical therapy for her low back pain.[32] Examination revealed diminished muscle strength, inability to tolerate repeated flexion and standing, and increased pain with all movements.[33] That same month, Plaintiff reported using a wheelchair and difficulty standing because of her back pain.[34] Diffuse muscle spasms, pain with lumbar extension, and difficulty arising from a seated position were noted.[35] In September 2017, Plaintiff reported worsening back pain.[36] A psychiatric evaluation noted that Plaintiff was oriented, her speech was fluent, her thought processes were clear, she had good insight, her mood was neutral, and her affect was appropriate.[37]

---

[27] *Id.* at 1312.

[28] *Id.* at 696.

[29] *Id.*

[30] *Id.* at 682.

[31] *Id.* at 678.

[32] *Id.* at 549.

[33] *Id.* at 551.

[34] *Id.* at 755.

[35] *Id.*

[36] *Id.* at 656.

[37] *Id.* at 658.

In September 2017, Plaintiff was seen for an independent evaluation of her lower back pain by James H. Maxwell, M.D.[38] While Plaintiff presented in a wheelchair, Dr. Maxwell found no organic explanation for her use of a wheelchair. Dr. Maxwell further found that there was no way the radiographic condition would cause Plaintiff's significant pain behaviors. Dr. Maxwell found that Plaintiff had received the maximum benefit from treatment and could return to work without restrictions.

In January 2018, Plaintiff presented with complaints of back pain.[39] Plaintiff used a wheelchair to ambulate.[40] Treatment notes reflect that Plaintiff was oriented, her speech was fluent, her thought processes were clear, she had good insight, her mood was neutral, and her affect was appropriate.[41]

In February 2018, Plaintiff was treated with a bilateral lumbar medial branch block, from which she reported 50% relief.[42] It was recommended that she receive a sacroiliac joint injection.[43] Plaintiff later reported up to 80% relief with sacroiliac joint injections.[44]

In March 2018, Plaintiff was treated for back pain and weakness.[45] However, an electromyogram was relatively normal and there was a suspected mental health component to

---

[38] *Id.* at 726–31.

[39] *Id.* at 1265.

[40] *Id.* at 1267.

[41] *Id.*

[42] *Id.* at 1353, 1374.

[43] *Id.* at 1378.

[44] *Id.* at 1352.

[45] *Id.* at 1340.

Plaintiff's complaints of pain.[46] It was noted that the physical examinations and radiological studies did not correlate to Plaintiff's stated symptoms.[47]

In July 2018, Plaintiff continued to use a wheelchair to ambulate.[48] A back brace was ordered.[49]

In January 2019, Plaintiff continued to complain of chronic low back pain, along with headaches.[50] In April 2019, she complained of low back pain and indicated she used a walker to ambulate.[51] Imaging was ordered and a lumbar fusion at the L5-S1 level was recommended.[52]

In September 2019, Plaintiff complained of worsening mid and low back pain.[53] She received a sacroiliac joint injection,[54] which she said provided 70% relief.[55] In November 2019, Plaintiff discussed the possibility of a spinal cord stimulator trial.[56]

In September 2020, Plaintiff had a spinal cord stimulator implant but continued to experience pain and required the use of a wheelchair.[57] However, she also stated that the spinal

---

[46] *Id.* at 1341–43.

[47] *Id.* at 1366.

[48] *Id.* at 1394.

[49] *Id.* at 1400.

[50] *Id.* at 1411.

[51] *Id.* at 1416.

[52] *Id.* at 1425.

[53] *Id.* at 1932.

[54] *Id.* at 1915.

[55] *Id.* at 1908.

[56] *Id.* at 1898.

[57] *Id.* at 1504–24.

cord stimulator helped some days.[58] In other instances she stated that it provided 50% to 60% relief.[59]

In February and March 2021, Plaintiff presented with complaints of low back pain.[60] Imaging conducted in March 2021 showed grade 1 spondylolisthesis at L5-S1 with severe bilateral foraminal stenosis.[61] In June 2021, Plaintiff returned for follow-up with complaints of back pain.[62] After the March 2021 imaging was reviewed, it was recommended that Plaintiff undergo a L5-S1 fusion,[63] which she did.[64] After the surgery, Plaintiff was admitted to inpatient home health, where she stayed for nearly a month.[65] Upon discharge, it was noted that Plaintiff had healed well with good results and that her occupational therapy goals had been met.[66]

In August 2021, Plaintiff presented with complaints of significant back pain.[67] But she noted that her medication helped.[68] X-rays from August and October 2021 showed a fusion at L5-S1 without complications.[69]

---

[58] *Id.* at 1743.

[59] *Id.* at 1757, 1837.

[60] *Id.* at 1504.

[61] *Id.* at 1686.

[62] *Id.* at 2141, 2149.

[63] *Id.* at 2152.

[64] *Id.* at 2134–36.

[65] *Id.* at 2385–2459.

[66] *Id.* at 2450.

[67] *Id.* at 2177.

[68] *Id.*

[69] *Id.* at 2183–84.

In December 2021, Plaintiff complained of muscle spasms and exacerbation of back pain.[70] The spasms were well controlled with medication, but Plaintiff did not like how the medication made her feel.[71] She reported that her spasms were less painful.[72] Mentally, she was in no acute distress, was pleasant, and had a normal affect and speech.[73]

In addition to her back pain, Plaintiff has a history of shoulder pain. In July 2019, Plaintiff presented with right shoulder pain.[74] Examination revealed no swelling or ecchymosis, though there was tenderness of the DT joint and a positive Speed's test.[75] It was determined that she likely had a notable rotator cuff tendinitis.[76] However, a right shoulder x-ray was normal and unremarkable.[77]

In August 2019, MRI findings were consistent with high-grade partial-thickness tear of the supraspinatus at the footplate and arthroscopic surgery was recommended.[78] Plaintiff underwent shoulder surgery in May 2020.[79] Plaintiff continued to have shoulder pain and

---

[70] *Id.* at 2382.

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Id.* at 1429.

[75] *Id.*

[76] *Id.* at 1430.

[77] *Id.*

[78] *Id.* at 1433.

[79] *Id.* at 1490–91.

received corticosteroid injections.[80] Six weeks after her injection, she reported doing well with only occasional shoulder pain.[81]

Plaintiff has also suffered from knee pain and has undergone knee surgery.[82] Two weeks after surgery, Plaintiff's knee was improving and she was able to ambulate using crutches and a brace.[83] Plaintiff had appropriate swelling and a 0–40 degree range of motion, but her knee was well-aligned and the hardware screws appeared well-fixated with no evidence of loosening.[84] Plaintiff began physical therapy and six weeks after the surgery she noted that her pain was improving.[85] By August 2017, Plaintiff stated that knee was good but her back was bad.[86]

With regard to her mental impairments, Plaintiff was seen by Heather Farnsworth, NP-P. NP-P Farnsworth completed a psychiatric/psychological impairment questionnaire on May 11, 2021.[87] NP-P Farnsworth opined that Plaintiff had marked limitations in a number of areas of mental functioning. She further opined that Plaintiff would be absent from work more than three times per month.

---

[80] *Id.* at 1500.

[81] *Id.* at 1502.

[82] *Id.* at 864, 1326–27.

[83] *Id.* at 861.

[84] *Id.*

[85] *Id.* at 855, 861.

[86] *Id.* at 545.

[87] *Id* at 1575–79.

At the initial hearing before the ALJ, Plaintiff testified that her pain interfered with her ability to stand and sit.[88] Plaintiff stated that movement increased her pain.[89] She further stated that she used either a walker or wheelchair to ambulate.[90] During the second hearing, Plaintiff testified that she had not been doing well since the first hearing.[91] She stated that she used a wheelchair to get around and had problems with her legs.[92]

C.      THE ALJ'S DECISION

The ALJ followed the five-step sequential evaluation process in deciding Plaintiff's claim. At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 6, 2017, the alleged onset date.[93] At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease of the cervical spine (with migraines), degenerative disc disease of the lumbar spine, rotator cuff repair of the right shoulder, history of knee replacements, and depression.[94] At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment.[95] The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with certain limitations.[96] At step four, the ALJ determined that Plaintiff

---

[88] *Id.* at 94.

[89] *Id.* at 96.

[90] *Id.* at 99–100.

[91] *Id.* at 63.

[92] *Id.*

[93] *Id.* at 15–16.

[94] *Id.* at 16–17.

[95] *Id.* at 17–20.

[96] *Id.* at 21–39.

was unable to perform any past relevant work.[97] At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform and, therefore, she was not disabled.[98]

## III.  DISCUSSION

### A.    LISTING 1.15

Plaintiff first argues that the ALJ failed to properly evaluate Plaintiff under medical listing 1.15 at step three of the sequential evaluation process. At step three, the ALJ must determine whether a claimant's impairments meet or equals a listed impairment.[99] If an impairment meets or equals a listed impairment, the claimant will be found disabled.[100] An impairment may equal a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment."[101] The ALJ is responsible for making this determination.[102] If an ALJ believes that the evidence does not support a finding of medical equivalence, no further factual development is required.[103]

---

[97] *Id.* at 39.

[98] *Id.* at 39–42.

[99] 20 C.F.R. § 404.1520(d).

[100] *Id.*

[101] *Id.* § 404.1526(a).

[102] *Id.* § 404.1526(e)(3).

[103] SSR 17-2p, 2017 WL 3928306, at *4 ("If an adjudicator at the hearings or AC level believes that the evidence does not reasonably support a finding that the individual's impairment(s) medically equals a listed impairment, we do not require the adjudicator to obtain ME evidence or medical support staff input prior to making a step 3 finding that the individual's impairment(s) does not medically equal a listed impairment.").

If an ALJ finds medical equivalence, they must articulate how the evidence supports that finding and "must provide a rationale for a finding of medical equivalence in a decision that is sufficient for a subsequent reviewer or court to understand the decision."[104] However, when the record does not support a finding of equivalence, "the adjudicator is not required to articulate specific evidence supporting his or her finding that the individual's impairment(s) does not medically equal a listed impairment."[105] Instead, "a statement that the individual's impairment(s) does not medically equal a listed impairment constitutes sufficient articulation for this finding."[106] This is so because "[a]n adjudicator's articulation of the reason(s) why the individual is or is not disabled at a later step in the sequential evaluation process will provide rationale that is sufficient for a subsequent reviewer or court to determine the basis for the finding about medical equivalence at step 3."[107]

Listing 1.15 is classified as:

Disorders of the skeletal spine resulting in compromise of a nerve root(s) (see 1.00F), documented by A, B, C, and D:
A. Neuro-anatomic (radicular) distribution of one or more of the following symptoms consistent with compromise of the affected nerve root(s):
1. Pain; or
2. Paresthesia; or
3. Muscle fatigue.
AND
B. Radicular distribution of neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1, 2, and either 3 or 4:
1. Muscle weakness; and

---

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

2. Sign(s) of nerve root irritation, tension, or compression, consistent with compromise of the affected nerve root (see 1.00F2)

3. Sensory changes evidenced by:

a. Decreased sensation; or

b. Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or

4. Decreased deep tendon reflexes.

AND

C. Findings on imaging (see 1.00C3) consistent with compromise of a nerve root(s) in the cervical or lumbosacral spine.

AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

1. A documented medical need (see 1.00C6) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

2. An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)); or

3. An inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements (see 1.00E4).

In response to medical interrogatories, the medical expert, Ashok Jilhewar, M.D., opined that Plaintiff satisfied listing 1.15 through medical equivalence.[108] As noted, listing 1.15D requires either a documented need for a mobility device or an inability to use an upper extremity.[109] While Dr. Jilhewar noted the medical evidence showing that Plaintiff has used a walker and a wheelchair to ambulate,[110] at the hearing he testified that an assistive device was

---

[108] R. at 2188–2203.

[109] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.15.

[110] R. at 2201.

not medically necessary.[111] Instead, Dr. Jilhewar believed that Plaintiff's use of assistive devices was a somatic issue about which he stated he was not qualified to testify.[112] The ALJ found Dr. Jilhewar's opinion persuasive to the extent it was consistent with the RFC assessment, noting that Dr. Jilhewar testified that an assistive device was not medically necessary.

In considering listing 1.15, the ALJ discussed the relevant medical evidence, including lumbar and cervical tenderness, decreased lumbar and right shoulder motion, sensory deficits, and muscle weakness.[113] The ALJ then compared that evidence to other medical evidence showing full muscle strength, adequate cervical motion, normal gait, normal heel to toe walk, and a negative electromyogram.[114] Based on this evidence, there was a conflict as to whether Plaintiff met the A, B, and C criteria of listing 1.15. Additionally, the ALJ cited Plaintiff's use of a wheelchair during medical visits and a walker for short distance ambulation.[115] But there were other examinations where Plaintiff had a normal gate and was able to ambulate without an assistive device.[116] In addition, the ALJ noted Dr. Jilhewar's testimony that an assistive device was not medically necessary.[117]

Based upon all of this, the ALJ concluded that Plaintiff did not meet or equal listing 1.15. Plaintiff complains that the ALJ did not adopt Dr. Jilhewar's opinion that Plaintiff medically

---

[111] *Id.* at 69. Plaintiff makes no argument suggesting an inability to use an upper extremity.

[112] *Id.*

[113] *Id.* at 18.

[114] *Id.*

[115] *Id.*

[116] *Id.*

[117] *Id.*

equaled listing 1.15. This argument fails for at least two reasons. First, as discussed, Dr. Jilhewar testified that an assistive device was not medically necessary. Thus, there was no medical evidence supporting the requirements of listing 1.15D, which requires a documented medical need for an assistive device.[118] Second, as discussed, it is the ALJ who must make the determination of medical equivalence, not the medical expert. While the ALJ was not required to obtain evidence from a medical expert, she considered that evidence and provided well-supported reasons that Dr. Jilhewar's opinion was not fully persuasive. Thus, the ALJ satisfied the articulation requirements at step three and her conclusion is supported by substantial evidence.

B.      MEDICAL OPINION EVIDENCE

Plaintiff next contends that the ALJ's analysis of the medical opinion evidence was flawed, leading to an incomplete RFC. For applications filed on or after March 27, 2017, an ALJ is not required to defer to or give any specific weight to medical opinions or prior administrative medical findings.[119] Rather, the ALJ considers them using the criteria in 20 C.F.R. § 404.1520c(c): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors tending to support or contradict a medical opinion or prior administrative medical finding. The most important criteria for determining persuasiveness are supportability and consistency.[120]

---

[118] *See also* SSR 96-9p, 1996 WL 374185, at *7 ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.").

[119] 20 C.F.R. § 404.1520c(a).

[120] *Id.* § 404.1520c(a), (b)(2).

The ALJ must articulate "how persuasive [he or she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record."[121] The ALJ must explain how he or she considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings but is generally not required to explain how he or she considered other factors.[122]

Social Security Ruling 96-8p requires the ALJ's RFC analysis to assess an individual's ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.[123] "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."[124] "The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual."[125] "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."[126] "If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."[127] "The RFC assessment must include a discussion of why reported symptom-related

---

[121] *Id.* § 404.1520c(b).

[122] *Id*. § 404.1520c(b)(2).

[123] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

[124] *Id.* at *3.

[125] *Id.* at *5.

[126] *Id.* at *7.

[127] *Id.*

functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."[128]

Plaintiff first takes issue with the ALJ's treatment of the opinions of Shauna McBride, PA-C. PA-C McBride completed a lumbar spine impairment questionnaire on March 26, 2021.[129] PA-C McBride diagnosed low back pain, lumbar radiculopathy, and chronic pain. PA-C McBride opined that Plaintiff could sit for 80 minutes and stand and/or walk for 5 minutes in an 8-hour workday. She further opined that Plaintiff would be absent from work more than 3 times a month.

The ALJ found PA-C McBride's opinions unpersuasive. The ALJ cited to medical evidence showing that Plaintiff's pain improved after surgeries and with aqua therapy, injections, and use of a spinal stimulator. The ALJ also noted that Plaintiff's pain was managed by medication. However, because the record showed lumbar and cervical tenderness, decreased lumbar and right shoulder motion, sensory deficits, and slight muscle weakness in the lower extremities and decreased brachial reflexes, the ALJ limited Plaintiff to sedentary work with restrictions.

In responding to the ALJ's evaluation of the evidence Plaintiff points to records that she contends support PA-C McBride's assessment. However, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings

---

[128] *Id.*; *see also Givens v. Astrue*, 251 F. App'x 561, 568 (10th Cir. 2007) ("If the ALJ rejects any significantly probative medical evidence concerning [a claimant's] RFC, he must provide adequate reasons for his decision to reject that evidence.").

[129] R. at 1473–79.

from being supported by substantial evidence."[130] Plaintiff essentially asks the Court to reweigh the evidence to reach a different conclusion, which it cannot do. Plaintiff also points to the opinion of Dr. Jilhewar, who reported that Plaintiff would miss about three days of work per month. However, as discussed, Dr. Jilhewar noted that Plaintiff's pain was somatic in nature and was beyond his area of expertise. Given that Dr. Jilhewar admitted that he was not qualified to testify as to Plaintiff's psychological issues, it was reasonable for the ALJ to find this portion of Dr. Jilhewar's opinion unpersuasive. In sum, the ALJ provided good reasons, supported by substantial evidence, to support her evaluation of PA-C McBride's assessment.

Plaintiff next argues that the ALJ erred in ruling that the opinions from a treating source—presumably the evaluation conducted by Courtney Ivory, DPT—were not credible when the ALJ stated that treatment notes did not show any complaints with sitting.[131] Plaintiff points to treatment notes that purport to show that Plaintiff did have trouble sitting.[132] However, by referencing these contrasting treatment notes, Plaintiff essentially asks the Court to reweigh the evidence. Further, these two treatment notes, from other providers, do nothing to call into question the ALJ's overall assessment of Ms. Ivory's opinions. The ALJ provided a number of reasons, complete with citations to the medical evidence, to support her conclusion that Ms. Ivory's limiting opinion was not persuasive, and Plaintiff has not challenged those.

Plaintiff also argues that the ALJ failed to properly evaluate the medical opinions concerning Plaintiff's mental functioning. Heather Farnsworth, NP, opined that Plaintiff had

---

[130] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

[131] R. at 35.

[132] *Id.* at 729, 785.

marked limitations in a number of areas of mental functioning.[133] She further opined that

Plaintiff would be absent from work more than three times per month. The ALJ found NP

Farnsworth's opinion unpersuasive because it was inconsistent with her treatment notes and was

apparently based on subjective report and complaints.[134]

     Similarly, the ALJ found the opinion from examining psychologist, Christina Ryser,

Ph.D., unpersuasive.[135] Dr. Ryser opined:

> The examinee appears challenged to consistently understand, remember, and apply
> information. She appears limited with the ability to learn, recall, and use
> information to perform work activities. While she may be able to follow some one-
> or two-step instructions to carry out a task, she is likely to struggle with
> detailed/complex instructions. She may also be challenged to use reason and
> judgment to make work-related decisions, depending upon her mental state at a
> given time. She appears limited to concentrate, persist, and maintain pace, with
> regards to focusing attention on work activities, and staying on task at a sustained
> rate. She is also likely to have difficulty with the ability to relate to and work with
> supervisors, co-workers, and the public on a consistent and independent basis.
> Overall, her mental disorders would keep her from regulating her emotions,
> controlling her behavior, and/or maintaining her well-being in a work setting, and
> she is likely to struggle in dealing with normal pressures in a competitive work
> setting.[136]

     The ALJ found that this opinion was not persuasive as it was not consistent with the

overall record.[137] In reaching this conclusion, the ALJ pointed to evidence of mental exams

showing normal attention span, intact memory, normal cognition, and full orientation. The ALJ

also pointed to Dr. Ryser's evaluation, where Plaintiff was able to spell forward and backward

---

[133] *Id.* at 1575–79.

[134] *Id.* at 37–38.

[135] *Id.* at 38.

[136] *Id.* at 2166 (emphasis omitted).

[137] *Id.* at 38.

and complete simple calculations. The ALJ also noted that Plaintiff had a good prior work history and that her mental exams were generally unremarkable.

Plaintiff argues that the ALJ failed to properly evaluate the opinions regarding her mental functioning. As above, Plaintiff points to evidence that might support a finding that Plaintiff's mental impairments were more severe than those found by the ALJ. However, it is the ALJ, not the Court, who weighs that evidence. The Court's function is to determine whether the ALJ's decision is supported by substantial evidence. Here, the ALJ provided legitimate, well-supported reasons for discounting the opinions concerning Plaintiff's mental functioning. The fact that there is evidence from which a different conclusion could be reached does not render the ALJ's conclusion unsupported.

C.     SUBJECTIVE STATEMENTS

Plaintiff next takes issue with the ALJ's evaluation of her subjective statements. The Tenth Circuit has established a framework for consideration of a claimant's subjective complaints of pain. An ALJ is to consider the following factors, commonly referred to as the *Luna* factors: (1) the levels of medication and their effectiveness, (2) the extensiveness of the attempts (medical or nonmedical) to obtain relief, (3) the frequency of medical contacts, (4) the nature of daily activities, (5) subjective measures of credibility that are peculiarly within the judgment of the ALJ, (6) the motivation of and relationship between the claimant and other witnesses, and (7) the consistency or compatibility of nonmedical testimony with objective

20

medical evidence.[138] These factors are not exhaustive[139] and the ALJ is not required to conduct a "formalistic factor-by-factor recitation of the evidence."[140]

    Similarly, under SSR 16-3p, the ALJ must first determine whether an individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms.[141] Next, the ALJ evaluates the intensity and persistence of an individual's symptoms to determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities.[142] In making this determination, the ALJ examines a number of factors, including:

> (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.[143]

In so doing, the ALJ does not "assess an individual's overall character or truthfulness."[144] Instead, the ALJ is to "focus on whether the evidence establishes a medically determinable

---

[138] *Luna v. Bowen*, 834 F.2d 161, 165–66 (10th Cir. 1987); *see also* SSR 16-3p, 2017 WL 5180304, at *7–8 (Oct. 25, 2017) (listing similar factors).

[139] *Huston v. Bowen*, 838 F.2d 1125, 1132 n.7 (10th Cir. 1988).

[140] *Qualls*, 206 F.3d at 1372.

[141] SSR 16-3p, 2017 WL 5180304, at *3 (Oct. 25, 2017).

[142] *Id.* at *4.

[143] *Id.* at *7–8.

[144] *Id.* at *11.

impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities."[145]

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms was not entirely consistent with the evidence.[146] The ALJ went on to exhaustively discuss the evidence relevant to the factors set out in *Luna* and SSR 16-3p. While Plaintiff requests the Court reach a different conclusion, the ALJ's finding is supported by substantial evidence.

D.      HYPOTHETICAL PROVIDED TO THE VOCATIONAL EXPERT

 "On step five, after the claimant has established at step four that he or she cannot return to his or her past relevant work, the burden shifts to the Secretary to show that the claimant retains the residual functional capacity (RFC) to do other work that exists in the national economy."[147] Vocational expert testimony that the plaintiff is capable of performing one or more occupations that exist in significant numbers is sufficient to meet the Commissioner's burden at step five.[148] However, "[t]estimony elicited by hypothetical questions that do not relate with

---

[145] *Id.*

[146] R. at 22–23.

[147] *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

[148] *See* 20 C.F.R. § 404.1566(e); *Ellison v. Sullivan*, 929 F.2d 534, 537 (10th Cir. 1990).

precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision."[149]

In the RFC assessment, the ALJ found that "[t]he claimant can understand, remember and carry out tasks that can be learned and mastered in 3-6 months due to a combination of pain and mental health symptoms. The claimant's time off task can be accommodated with normal breaks."[150] At the initial hearing, the ALJ provided the VE with a hypothetical where an individual was "able to do tasks that can be learned and mastered in three to six months due to pain, time off task can be accommodated by normal breaks."[151] At the supplemental hearing, the hypothetical individual was "limited to SVP: 2 work or work that could be learned and mastered in three to six months, like we discussed last time."[152]

Plaintiff argues that the ALJ's hypothetical fails to account for the moderate limitations the ALJ found in concentrating, persisting, or maintaining pace.[153] However, the Tenth Circuit has held that moderate limitations in concentration, persistence, and pace can generally be accommodated by a limitation to unskilled work.[154] Here, the ALJ adequately accounted for

---

[149] *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990)).

[150] R. at 21.

[151] *Id.* at 106.

[152] *Id.* at 73–74.

[153] *Id.* at 20.

[154] *Vigil v. Colvin*, 805 F.3d 1199, 1204 (10th Cir. 2015).

Plaintiff's moderate limitations in concentration, persistence, and pace by limiting Plaintiff to an SVP of 2.[155]

## RECOMMENDATION

For these reasons, the undersigned recommends the ALJ's decision be affirmed.

Copies of this Report and Recommendation are being mailed to all parties who are hereby notified of their right to object. The parties must file any objection to this Report and Recommendation within fourteen (14) days of service. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to object may constitute a waiver of objections upon subsequent review.

DATED October 11, 2023.

BY THE COURT:

PAUL KOHLER
United States Magistrate Judge

---

[155] *Id.*; *see also* SSR 00-4p, 2000 WL 1898704, at *3 (stating that "unskilled work corresponds to an SVP of 1-2").